SARAH J. STUBLY v. DAVID J. BEACHBOARD AND ANDREW J. JOHNSON.

*Fraudulent representations—Pleading—Addition of counts separating transactions relied upon—Evidence—Scienter.*

1. Where, in a suit to recover money which the plaintiff claims to have been induced to part with and lay out and expend by means of the fraudulent procurement of the defendants, the declaration properly counted upon *three* transactions as *one* deal from its commencement to the final ending, counts added by amendment separating the three transactions do not set forth a new cause of action.

2. The note of a *third* person, which may be needed as evidence in a suit to recover money alleged to have been fraudulently obtained of the plaintiff, need not be surrendered to the *defendants* before bringing such suit.

3. In a suit against *two* defendants to recover money alleged to have been obtained of plaintiff upon a worthless mortgage executed by a *third* party, it is competent for the plaintiff to testify to statements made to him by *one* of the defendants *after* the mortgage was given, indorsing said security, as tending to show his concert of action with his co-defendant, who was *active* in procuring the money.

4. In a suit for the recovery of money loaned to *third* parties on the representations of the defendants that the title to the land was

68 MICH.—26.

68   401
70   61
68   401
72   271
68   401
74   577
68     401
104    630
68     401
107    358
108    607
68   401
119   470
68     401
126    643
68     401
s36NW  192
f131  5247
68   401
f158  5297

*perfect,* evidence of its occupancy at the time by claimants of the *original* title is competent to show the falsity of such representations.

5. In actions involving alleged fraud, when the knowledge and. intent of the defendant is a material fact, evidence may be received of similar acts which happened shortly before or after, and which had no direct or apparent connection with the principal transaction; and where the question is whether a purchaser of goods procured them through fraud, distinct purchases made by him under similar circumstances, at or about the same time, and when the like motive may be reasonably supposed to have operated, are admissible in evidence with a view to the *quo animo.* *Beebe v. Knapp,* 28 Mich. 65.

Error to Lenawee. (Howell, J.)   Argued January 5, 1888. Decided February 2, 1888.

Case.   Defendants bring error.   Affirmed.   The facts are stated in the opinion.

*Bean & Lane,* for appellants.

*Weaver & Weaver,* for plaintiff.

LONG, J.   The declaration in this cause alleges, substantially, that plaintiff is the wife of one Casper Stubly, and, with her husband, has lived for 25 years and upwards at Rollins, in Lenawee county, during all which time said Casper was and still is acting as agent for plaintiff in loaning money; that said Casper can neither read nor write, and plaintiff but indifferently, and that defendants, who reside at Hudson, in said county, had full knowledge of such facts.

That on the twelfth day of February, 1876, defendants, fraudulently contriving and intending to deceive, cheat, and defraud plaintiff of large sums of money, at Hudson, in said county, and well knowing that plaintiff had money to loan, designedly, falsely, deceitfully, fraudulently, and feloniously pretended to said Casper, agent of plaintiff, that Johnson (one of said defendants) had agreed to loan one Turner some

money (one James P. Turner, of Pittsford, Hillsdale county), but that he, said Johnson, had had to furnish some money to his brother, who had got into trouble down east, and so could not spare the money, and desired to have plaintiff make such loan; that Turner would give plaintiff a mortgage upon 40 acres of land in Ionia county to secure said loan; that the title to said land was good; that the land was good and valuable, and was good security for a loan of $460; and that said Beachboard (the other defendant) had once owned it, and had sold it for $1,300.

That said Casper, believing in and relying upon said statements, communicated same to plaintiff, and she, relying thereon, directed Casper to make said loan; that said Casper made said loan of $460 of the money of plaintiff, and took said Turner's note therefor, due in five years from date, with interest at 10 per cent. per annum, secured by mortgage of same amount, made by Turner on said Ionia county land, described as the south-east quarter of the north-west quarter of section 19, township 5 north, range 6 west, Ionia county; that before paying over the money Casper required an abstract of the title to said lands, and placed said moneys in the hands of Beachboard, who was to hold the same till Turner furnished said abstract; that afterwards Beachboard pretended said abstract had been furnished, and he found the title all right.

Plaintiff avers that the title was not all right or perfect; that Turner only had a tax title thereon ; that said tax title had passed through several hands, of whom Beachboard was one; that the title was in the heirs of one John Barber; that the land was not good security for the amount of the $460, but, on the contrary, was of little value, not worth over $100; that it was wild, swampy, and uncultivated and untillable, and distant from any road,—all of which facts the defendants then well knew.

That in September, 1877, defendants informed plaintiff

that said Turner had sold said land to one David Tubbs, and advised plaintiff that it would be better for her to take a deed from Tubbs of the land than to foreclose her mortgage thereon, and offered to procure said deed for $70, which plaintiff then paid defendants, and obtained said deed.

That afterwards, and on October 27, defendants, further contriving and intending to cheat plaintiff, and defraud her of the said $460 and the said $70, falsely represented to said plaintiff and Casper that one Joseph Bathrick desired to loan a sum of money of plaintiff, and to purchase said Ionia land, and as security for said loan and land would give a mortgage on an 80-acre farm owned by him near Flint, in this State; that said land was a good, valuable, and improved farm worth $4,000, had good buildings, was well stocked, the title thereto perfect and all right, and that he wanted the money to build a large barn on said farm; that he wanted the interest payable on the first day of January in each year, to give him time to turn off his fat cattle, hogs, and produce; that it was in an old improved country and neighborhood, and was ample security. And, being informed by plaintiff that she had no ready money to loan, defendants then said they would take three small mortgages which plaintiff had, and cash them. Defendant Beachboard then took from his pocket and read to said Casper what he (defendant) said was an abstract of title to said Bathrick's farm, near Flint. Said defendant Beachboard then caused to be drawn a deed from plaintiff to said Bathrick of the Ionia land, and assignments of the three small mortgages,—one to said Beachboard, for $173.99, one to said Johnson, for $170.67, and one to one George R. Beardsell, a former partner of said Beachboard, of $100 and interest,—all of which plaintiff then and there executed and delivered to said defendants, and in exchange therefor received from said Bathrick a mortgage of $1,155.55, due in five years from date, with interest at ten per cent., payable on January 1, annually, on what plaintiff then.

believed was said farm near Flint, and also the note of said Bathrick for the same amount accompanying said mortgage.

Plaintiff avers that, in fact, said land mortgaged was not 80 acres of land near Flint, but said land was situated in Lake county, Michigan, nearly 200 miles from Flint, and described as the north half of the north-west quarter of section 20, township 17 north, range 12 west, Lake county; that said land was not worth $4,000; that it was not worth over $200; that it was not good land, but is what is called "jack pine" land; that it was not an improved farm, but only had about 12 acres cleared, and that only indifferently; that it had no buildings except a dilapidated log house and barn of no value, and was not stocked at all; nor did said Bathrick and wife live on said farm, nor did they live near Flint, but did live at Pittsford, about six miles west of Hudson; nor did said Beachboard have an abstract of said land, —all which matters defendants then and there well knew.

Plaintiff further says that, no interest being paid on said mortgage, she caused the same to be foreclosed, and then for the first time discovered the real location of said land, but not till long after the foreclosure did she discover its real condition and value; that said land was sold on said foreclosure on June 6, 1879, for unpaid interest and costs of foreclosure, amounting in all to the sum of $199.33, subject to the payment of the principal sum of $1,155.55, and was bid in by plaintiff, and in default of redemption said mortgage title has become absolute in plaintiff; and the plaintiff says that said land is of no value, and she has entirely lost and been defrauded of said several sums of money, the three small mortgages, and her costs and expenses aforesaid. And plaintiff says that after the discovery of the fraud so practiced upon her, and before the commencement of this suit, she executed and acknowledged, and caused to be tendered to said defendants, a deed to said Lake county lands, in trust for said Joseph Bathrick, mortgagor, and at the same time

caused to be demanded of said defendants the said several sums of money so paid over to them; and that said defendants refused to accept said deed, or repay plaintiff any sum of money whatever, etc.

In the second count of her declaration the plaintiff alleges that on the third day of March, 1876, at Hudson, aforesaid, the said defendants, well knowing that plaintiff had money to loan, and that her husband, said Casper, was acting for her in the loaning thereof, and that said Casper could neither read nor write, and that plaintiff could only do so in a very indifferent manner, and that Casper and plaintiff confided in the honesty and truthfulness of them, the said defendants, and each of them, then and there, with intent to cheat and defraud the plaintiff of large sums of money, designedly, deceitfully, falsely, and fraudulently pretended and represented to said Casper that the said Johnson had promised to loan some money to a Dutchman living on his farm in the township of Wright, Hillsdale county, Michigan, but that his, said Johnson's, brother had got into some trouble down east, and he had had to help him, and so could not loan the money to the Dutchman, but wanted to loan the money of the plaintiff for the Dutchman, and thereupon introduced to said Casper the said Dutchman, one Frederick Ditmer, and the said Ditmer then and there, in presence of said defendants, and at their instigation, then stated that he wanted a loan of $860, and would give as security a mortgage on his 80-acre farm situate in South Wright, Hillsdale county, Michigan; that said farm was a good improved farm, clear from all incumbrances, and that the title was good, and that it was good security for said loan.

That Casper then stated he would make the loan, if the title was all right, when said Beachboard took from said Ditmer a paper, and then and there, in presence of said Johnson, read over what he said was an abstract, and which sounded to Casper like an abstract, and stated that the

abstract was all right, and the title all right, and that it was a good improved farm in South Wright; and the said Beachboard thereupon caused a mortgage to be drawn and executed by said Ditmer upon what Casper believed, and what said defendants then said, was said South Wright 80-acre farm, running to plaintiff for the sum, as Casper then supposed, of $860, due in five years, with interest payable semi-annually at 10 per cent.; whereupon said Casper, acting for plaintiff, handed to said Beachboard the sum of $860, and said Beachboard then stated he would take said mortgage, and send it to Hillsdale for record.

And the plaintiff says that, in fact, the land upon which said mortgage was given was not located in South Wright, nor in Hillsdale county, but, on the contrary, was located in Saginaw county, Michigan, and described as the west half of the south-west quarter of section 2, township 9 north, range 4 east; nor was said mortgage given for $860, but was for the amount of $825, with interest payable annually; nor did said Ditmer live on said land; nor was said land a good improved farm, but was wild land of little value; nor was said land good security for $860, or any other sum whatever; nor was the title thereto good or perfect, nor had said Ditmer any title thereto, except a tax title, which was disputed by parties, whose assigns have since gone into possession; nor did said Beachboard have an abstract therefor,—all which matters and things the said defendants then and there well knew, and fraudulently concealed from plaintiff and said Casper.

That on the twenty-sixth day of September, 1876, the defendants, still contriving and intending to cheat and defraud the plaintiff of said $860, and the interest thereon, then and there pretended that said Ditmer and one John Wean had traded farms, and that said Wean wanted plaintiff to discharge her said Ditmer mortgage on said South Wright farm; that said Wean wanted some more money, and would give a mortgage for the whole sum on lands in Saginaw

and Montcalm counties, a part on one and a part on the other; that said Saginaw county lands consisted of 80 acres, and was splendid timbered lands, and that the title was good and perfect; that said Montcalm county land was an 80-acre farm, an old improved farm, worth $3,000, with good buildings, and that the title thereto was good and perfect.

That said defendant Beachboard then and there read what he pretended was an abstract of each piece of land; that said defendant Beachboard then drew up, and said John B. Wean and wife executed, two mortgages, one of $600 upon said Saginaw county land, due in three years, with interest at 10 per cent. per annum, and the other for $939.53 upon what plaintiff then supposed was the Montcalm county land, as described by said defendants and said Wean; that thereupon plaintiff made and executed and delivered to defendants a discharge of said Ditmer mortgage, plaintiff still believing that said Ditmer mortgage had covered the lands in South Wright, Hillsdale county, as represented by defendants; and plaintiff also gave to defendants a sum of money, which, with the $860 and interest, amounted to the sum of $1,539.53.

And the plaintiff says that the Saginaw county land, upon which the $600 Wean mortgage was given, was and is in fact the same land upon which the Ditmer mortgage was given for the $825, and is described as the west half of the southwest quarter of section 2, in township 9 north, range 4 east, Saginaw county; that said Wean had no title thereto except a tax title; that the holders of the original title claimed to hold the same, and had gone into possession; that the land was not well timbered, and was not valuable, being of very little value, and not good security for $600, nor for any other sum; that the land upon which the other Wean mortgage was given, being for the sum of $939.53, was not located in Montcalm county, but was the north half of the south-east quarter of section 8, township 11 north, range 16 west, Muskegon county, this State; that it was not an old improved

farm, worth $3,000, but was very poor land,—what is called "buckwheat" land,—in a deserted section of the country, no one living upon it, no buildings except a small uninhabitable house, fences and timber burned off and destroyed, only a few acres ever having been cultivated, and the taxes unpaid, and the land returned and sold for taxes,—all which facts the defendants then and there well knew.

Plaintiff further says that, no interest being paid on either of said mortgages, she caused said mortgages to be foreclosed, and upon said sale purchased in said Saginaw county land for the sum of $897.60, on January 10, 187), and said Muskegon county land for the sum of $1,276.21, on January 11, 1879, that being the amount due upon each of said mortgages, with costs of said foreclosure; and that the title to each of said pieces of land has now become absolute in the plaintiff.

And the plaintiff says that said land, and each parcel thereof, are of no value, and that she has lost and been defrauded of the said several sums of money, and the interest thereon, and her costs and expenses aforesaid; that upon the discovery of the frauds so practiced upon her, and before the commencement of this suit, she executed and acknowledged, and caused to be tendered to said defendants, a deed of said Saginaw and Muskegon county lands, in trust for said John B. Wean and wife, the mortgagors, and at the same time caused to be demanded of the defendants the said several sums of money so paid over to defendants; that defendants refused to accept said deed, and refused to pay said several sums of money, or any sum whatever, etc.

This declaration was filed in the cause on the third day of November, 1882.

On September 15, 1885, plaintiff, by leave of the court, filed amendments to her declaration, by adding five new counts thereto.

The first *added* count sets out the Turner transaction, sub-

stantially as set out in the first count, and claims a recovery of the moneys, by reason of the fraud, that plaintiff advanced upon the Turner note and mortgage.

The second *added* count sets out the Turner transaction, and the procuring of the Tubbs deed of the Ionia land, the payment by plaintiff to defendants of the $70 in procuring the Tubbs deed, substantially as set out in first count of declaration, and claims a recovery of the money, by reason of the fraud, that plaintiff advanced upon the Turner note and mortgage, and the $70 advanced in procuring the Tubbs deed.

The third *added* count sets out the Bathrick transaction, substantially as set out in the first count of the declaration, and claims a recovery by reason of the fraud for the value of the three small mortgages, and the value of the Ionia county land.

The fourth *added* count sets out the entire Ditmer transaction up to the taking of the Ditmer mortgage, substantially as set out in the second count of the declaration, and claims a recovery of the moneys, by reason of the fraud, advanced upon the Ditmer mortgage.

The fifth *added* count sets out the entire Wean transaction, the discharge of the Ditmer mortgage, and the giving of the two Wean mortgages and foreclosure of the same, the tender of the deed to the defendants for use of Wean and wife, substantially as set out in the second count of the declaration, and claims a recovery of the moneys, by reason of the fraud, advanced by plaintiff on the Ditmer and Wean mortgages.

After these counts were added to the declaration, the defendants' counsel, before the trial came on, asked an order striking these amendments to the declaration from the files for the reasons:

"1. That the causes of action set out and alleged in said last five counts, and each of them, did not accrue within six years next preceding this date.

"2. That each of said counts, if it sets out a cause of action at all, sets out a cause of action which did not accrue within six years next preceding the allowing of said amendments, nor within six years next prior to the entry of the special motion asking for such amendments.

"3. That each of the causes of action set out in said counts, so added by amendment, are new and different causes of action from those set out in the declaration before said counts were added.

"4. For the reason that no recovery could be had upon the declaration before said amendments were allowed, nor could any evidence be introduced thereunder, because each of the counts therein contained embraced in its allegations more than one distinct and several cause of action."

The court overruled this motion.

The defendants pleaded the general issue, and gave notice under their plea that—

"They will give in evidence and insist in their defense that no one of the causes of action set forth and alleged in the five counts of the plaintiff's declaration above referred to accrued within six years prior to and next preceding the allowing of said amendments this day, and, if they ever existed, are barred by the statute of limitations."

The cause came on for trial, and plaintiff recovered verdict and judgment for $1,479.50. The defendants bring error.

The first four assignments of error relate to the exceptions taken by the defendants upon the refusal of the court to grant the motion to strike from the files the five counts added as amendments to the declaration, and the refusal of the court to strike out any and all evidence taken under said added counts.

It was insisted upon the trial, and is insisted, upon here, that the two counts in the declaration, as it stood before the addition of the last five, are framed in disaffirmance of the several transactions which furnish their subject-matter; that they each allege a fraudulent procurement of the several sums of money invested by plaintiff in each, a tender back of

what had been received, and a claim for money and property advanced upon the faith of the fraudulent representations; and that the first of the five counts added by amendment is one which counts upon the Turner transaction by way of affirmance of the transaction, and asks for damages suffered by reason of the fraud alleged ; and that the plaintiff should not have been permitted to add this third count by amendment, for the reason that the cause of action therein was a new and distinct cause of action from any counted upon in the declaration before such amendment, and that the cause of action stated in said added count is one barred by the statute of limitations. The same complaint is made as to the second of the five added counts.

The objection to the fourth added count is that it stands in the same relation to the second count of the original declaration as the first and second added counts do to the first count of the original declaration, and that the fifth added count stands in the same relation to the second count of the original declaration as the fourth added count does to the said second count.

We need not discuss the third added count, as the court took all questions arising under that from the jury.

We do not view the declaration in the light claimed by defendants' counsel. The first count of the original declaration counted upon the Turner, Tubbs, and Bathrick transactions as one transaction; that is, that the Tubbs transaction grew out of the Turner matter, and that the Bathrick matter was the final issue of that, and grew out of both the Turner and Tubbs transactions; that it was one deal from its commencement to the final ending, in putting upon plaintiff the Bathrick note and mortgage; and the claim for damages in that count is stated substantially as follows:

" That she has been put to other and further trouble and expense in and about trying to collect the interest on the said mortgage [the Bathrick mortgage] and the Turner mortgage,

and in and about trying to ascertain the location and condition and value of said Ionia and Lake county lands; * * * that the said land is of no value to her, and she has entirely lost and been defrauded of the said several sums of money, and the three small mortgages, and her costs and expenses aforesaid."

That is, that, by reason of the fraud practiced upon her, she has been defrauded of the. moneys entering into the Bathrick mortgage, the value of the three small mortgages, and the costs and expenses she has been put to in ascertaining the value, location, and condition of the Ionia county land. The first, second, and third added counts separated these transactions, counting upon the Turner, Tubbs, and Bathrick transactions each separately, and claiming a recovery for the value in each transaction of what plaintiff has been defrauded. The basis of plaintiff's recovery would, either under the original first count or under the first three added counts, have been the amount of money and interest upon it that plaintiff had been induced to part with, and to lay out and expend, by the fraudulent procurement of the defendants.

These added counts did not set out any new cause of action. They simply separated into three parts what had appeared as one entire transaction in the first count. If it became necessary for plaintiff's recovery to add these amendments, they were properly added.

We do not see, however, any necessity for the amendments. If the plaintiff had a right of recovery, we think her action could be maintained under the first count of the original declaration upon all three transactions. We also think the second count of the original declaration was sufficiently explicit to allow a recovery for the Ditmer and Wean transactions. If either party had a right to complain of the rulings of the court upon the pleadings, surely it was not the defendants.

At the close of the trial the court instructed the jury as follows:

"She has set forth her claim against the defendants in seven separate counts in her declaration. I think she cannot have any recovery under the first, second, and fifth counts. I think she can recover nothing on account of the loan to Bathrick, and for the three small mortgages assigned to Johnson, Beachboard, and Beardsell, for the reason that when she tendered back the deed of the Lake county land, after the foreclosure of the Bathrick mortgage, she did not tender back the Bathrick note given with the mortgage. Hence the Bathrick loan and mortgage, and the three small mortgages above mentioned, will be dismissed from your further consideration in this case."

As we have before remarked, the first and second counts of the declaration were sufficiently specific to allow a recovery for all the moneys the plaintiff lost by the fraudulent practices of the defendants in all the transactions. The defendants had no right to complain of the ruling of the court upon this part of the case. If the jury believed the testimony of the plaintiff, and her husband, Casper, and the other witnesses offered by her, corroborated by the documentary evidence introduced, they could not but believe that a most outrageous fraud had been practiced upon the plaintiff by the defendants and the parties whom they had brought to their aid in these several transactions, and the whole matter should have been submitted for their consideration.

The fact that the Bathrick note was not tendered to defendants at the time the deed was tendered was not a matter of which defendants could complain, and it might become a matter of important evidence for the plaintiff on the trial. *Dayton v. Monroe*, 47 Mich. 194 (10 N. W. Rep. 196). If the plaintiff's theory is correct,—and evidence was offered tending to prove it,—a wicked and deliberate conspiracy was inaugurated, and cunningly carried out, in all its details, to defraud the plaintiff of large sums of money, and the

whole matter should have gone to the jury for their consideration.

The fifth assignment of error relates to the overruling of defendants' motion to strike out the statement of Casper, plaintiff's husband and agent. Casper stated:

"After making the Wean mortgages at the bank, I went up to the corners by Boies' store, and met Johnson. He says, 'You have got them all?' Says I, 'Yes.' Says he, 'Don't you want to sell it?' I told him, 'No.' 'Well,' says he, 'It is a good thing.'"

Witness then stated:

"I had not had any talk with him before about the Wean mortgage."

We think the testimony was properly admitted. It had a tendency to show Johnson's connection with and knowledge of the Wean transaction, and his concert of action with the defendant Beachboard, who was actively engaged in procuring the money from plaintiff upon the mortgage.

There was no error in refusing to strike out the testimony of Casper regarding what Beachboard said to him about the taxes on the Muskegon land, and about going to look at the land, and a man being found dead, which is the basis of the sixth assignment of error. This evidence was proper, as bearing upon the defendants' knowledge of the worthlessness of the land, and tended to show that the statements they made about the land they knew to be false, and that they wanted to deter Casper from finding out the falsity of such statements.

The seventh to twelfth assignments of error relate to objections made to the testimony regarding the Saginaw land. This evidence was competent, and referred to the occupancy of the land by persons claiming the original title. This was not competent for the purpose of showing that the holders of the original title had a better title than Ditmer and Wean, but to show the falsity of the representations made by defend-

ants, and that the title of Ditmer and Wean was not a good and perfect title, but that there was at that time persons in actual possession, and that Ditmer or Wean had never been in possession. The moneys were loaned as an investment, and defendants knew plaintiff would not loan money upon land to which the title or possession was in dispute.

The fifteenth and sixteenth assignments of error relate to the following questions put to Casper:

"If you had known, Mr. Stubly, that the Ionia land was nothing but a tax title, and that that was the only title Turner had for it, would you have made the loan of $460?"

And again:

"If you had known people were living on part of it [the Saginaw land], claiming to own it at that time, would you have put any more money on it?"

This evilence was properly admitted.

The plaintiff's claim, and the case made by the proofs, was that the defendants' representations in regard to the securities were, among other things, that the titles to the lands on which it was proposed to make the loans were good and perfect, and that was one of the assurances that the money would be safe, and the evidence bore on their reliance upon defendants' statements, and tended directly to prove their falsity, for a title which was liable to dispute did not fulfill their statement that it was a good and perfect title; and especially was this true when defendants claimed to have an abstract showing the title as good and perfect, they having full knowledge that Casper, acting for plaintiff, was unable to read and write.

The eighteenth, nineteenth, twenty-first, and twenty-second assignments of error relate to the objection to the proof of the titles to the Saginaw and Ionia lands. We think this evidence was properly admitted; and there was no error in receiving in evidence the two deeds tendered to defendants.

The other assignments of error relate to the refusal of the

court to give in charge to the jury certain requests of the defendants. We find no error in this. The charge of the court to the jury was very full and explicit upon all the questions raised, and, as we have before remarked, if either of the parties had a right to complain of this charge, it was the plaintiff.

The thirteenth and fourteenth assignments of error raise the principal point in the case, and is one of the points most strenuously urged by defendants' counsel for the reversal of the judgment. These assignments of error relate to the admission of the evidence, under defendants' objection, of one Andrew McCarl, who testified, in substance that—

"In August, 1877, he went to Beachboard, in the village of Hudson, and asked him if he was a real estate agent, and he said he was, and he told him that he desired to sell or exchange his house and lot in the village of Hudson for land in the state of Illinois; that it run along with different talks until November; that Beachboard came to him, and represented to him that one Mrs. Updyke had 160 acres of land in Missouri, which he represented as being a very nice 160 acres of land,—as nice a 160 acres as lays out doors,—good farming land, in a good country, timbered with white oak, whitewood, and black walnut, and only 90 miles from St. Louis, Missouri, for which he asked $1,800; that he and Mr. Beachboard talked the matter over, and he told Mr. Beachboard that if he traded he would trade even or he would not trade at all; that they went to Beachboard's house, and that Beachboard got a plat, and showed him by that about the land,—showed him where the plowed land was and where the timber was; that the timber was very nice, a kind of oak, whitewood, and black walnut; that witness told him that he did not want so much land, and did not want to go so far off; that Beachboard said only 90 miles from St. Louis; that Beachboard told him that he had seen parties who had been there, and that it was as nice a 160 acres of land as lays out of doors; that he, witness, said if you will tell me who these parties are, I will go and see them, and talk with them about the land; that Beachboard said he need not do that, for he had seen them, and he was doing this work for him, and would not cheat witness out of a dollar; that witness said he would trade even if he traded at all.

"That Beachboard said to him that he should go and see Updyke, and told witness he might see Mr. Johnson, the defendant; that witness went to see Mr. Johnson, and saw him by the post-office, and Mr. Johnson recommended it (the land) as a good piece of land; that witness said to Johnson, 'Well, Mr. Johnson, if it is not a good piece of land, I don't want it at all;' that he (Johnson) had seen a letter telling about it; that it was good land; that it was a nice 160 acres.

"That Updyke came to witness' house to look at it, and looked the house over, and Updyke said that it was a very nice little house, and then witness and Updyke talked about the trade, and witness said that he would trade even or not at all, and Updyke took him up and said they would trade; that they went over to town; that Johnson went with Updyke to his (witness') house at that time; that when they were there Johnson, in reply to a question of witness' wife, said that it was a good farm,—a good straight farm; that Updyke said it was a good 160 acres of land; that Mr. Johnson said but very little; that they went back over town, and met Beachboard, who asked witness how he had traded, and witness replied that they had traded even. They went up to Hiller's office, Mr. Beachboard and himself and Mr. Updyke, and (Mr. Johnson not going up) Beachboard said to Johnson, 'Better come up,' but he said, 'No.' Beachboard had Mr. Sawyer draw up a deed of the house and lot. Mr. Beachboard, in reply to a request of the witness, said that witness could have an abstract.

"That the deeds were drawn and signed, and witness paid Beachboard $1.10 in silver to get it recorded; that he did not get an abstract; that he afterwards learned, when it came back, that the deed on the Missouri land was for only 80 acres, instead of 160 acres, of land; that before the deed got back he heard that the land was not good for anything; that, after learning this, witness had no talk with either Beachboard or Johnson, but went to see Mr. Keith; that he afterwards took steps to get his land back, the deed being made in November, and he got it back in July following; that he employed Mr. Salsbury to get it back for him."

Being cross-examined by counsel for the defendants, the said McCarl gave evidence tending to prove that,—

"At the time the land was deeded to him, Beachboard told Sawyer that it was 160 acres; that he (witness) told Mr.

Beachboard that he would give him $25 if he sold his place for cash, and $5 if he disposed of his property for him by trade; that after the transaction was all completed, and settled up, and he had got his house and lot back, he paid Beachboard the $5 as he had agreed to, understanding that he owed Beachboard the $5 for doing what he did; that Mr. Beachboard did not claim to have seen the land, but said he had seen parties that had seen the land, and had a letter commending it (the 160 acres of land), which he read to him; that he did not make any other representations than those contained in the letter which he read, and what parties had told him about its being a good 160 acres of land. That since this transaction witness has always trusted Mr. Beachboard, and Beachboard had done his business for him, and witness had worked for him upon his land. This was in answer to a question, and was answered by 'Yes.'"

These assignments also relate to the ruling of the court in admitting the testimony of one William Keith, who gave testimony tending to show that he knew Mrs. Updyke, who at one time owned a piece of land in Missouri, which witness some 16 or 17 years before went to see; that he could not remember the exact distance the land was from the railroad, but thinks it was some 40 miles, but since then the railroad has gone up so it is within some 20 to 25 miles of it; that he went through a wild country to get to it; that he found it through a man whom he hired to go with him, who was well acquainted with the country, and knew all about the land.

"Found it in a wild state; was not settled. The surface was rough, mountainous, and rocky, covered with stones, timbered with small oak, and I have understood there was some basswood and sycamore. The bottom lands were rough, and there was no timber. This was half a section of land. I do not think the land was worth anything at all."

That when he came home he reported to Mr. Updyke; that they went on horseback something over 20 miles; that there were no roads, nothing but trails.

"It was very mountainous and rocky, and we probably had to travel a good deal more than 20 miles to get there. Some

streams hindered us. Found the land in that wild state. No settlers there, only two log huts on the way, one within a half mile of the land. The land was not tillable."

Counsel for the defendants objected to the last statement as immaterial and incompetent, and moved to strike it out, which motion was then and there overruled by the court, to which ruling the defendants excepted.

Witness further gave evidence tending to show that he knew McCarl, a colored man living in Hudson, now here in court, and of his coming to see him about the land six or eight years ago; that Mr. Beachboard asked him once in Hudson about the land, where it was, saying that he talked of going to that country, and did not know but he could look after it, or something like that; that it was before the talk with McCarl that he talked with Beachboard.

Upon cross-examination by counsel for the defendants, witness further gave evidence as follows: That all he knew about this being the indentical land described in the deed of Mrs. Updyke was what he was told,—what the sheriff told him, and what he got from the records; that he could not tell from the records whether that was the land or not; that he could not tell whether he got at the section corner; that he could not tell whether it was the north-east or south-east corner of section one, two, or three, of his own knowledge; that the only way he could tell which section he was on was by the paper; that there were numbers on the sections; that a man who lived about a half a mile from there told him that his land was on the corner of the last section; that he judged that this land was in some other section; that there were numbers on the corners; that this was the number on the section and the section corner, "but I could not tell whether it was the east half or the west half."

He was asked the following questions by counsel for the defendants:

"Do you testify that you know of your own knowledge

that you were on the land described in Mrs. Updyke's deed?
Do you know that of your own knowledge, or do you judge
from what was told you, what the other man told you, that
it was?"

Witness replied:

"No; I do not know anything about it, whether I was on
the land described in Mrs. Updyke's deed or not."

He further said that he judged from what he found out
from the register of deeds, and from the plat he had compar-
ing with the deed he had; that the plat was marked in sec-
tions and townships,—no other marks upon the plat except
sections and township marks; that there were marks of sec-
tion corners on the plat.

"We had the plat of the land with us, and there were
numbers on the corner stakes.   I satisfied myself we were on
the land we were looking for.   Cannot now remember the
number of the section it was."

Witness was further asked by counsel for the defendants
the following question:

"Then, as I understand, you do not know, of your own
knowledge, as to whether you were on that land or not,
except what you gleaned from the sheriff and the other man;
is that true?"

To which witness replied:

"As I said before, that is all I know about it,—all I had
to go by."

The foregoing is a substantial statement of all the testi-
mony of said witness in regard to the identity of the land
he saw as the land described in the Updyke deed.

Defendants' counsel claim that this case comes within the
ruling in the case of *Parker v. Armstrong,* 55 Mich. 176 (20
N. W. Rep. 892), and that the testimony of these witnesses
was incompetent, and ought to have been excluded.   There
is no warrant for such an assumption.   The case of *Parker*

*v. Armstrong* was a very different case, and this Court said in that case:

". As the notes were genuine and good against Crapser, it is not plain what room there was for the doctrine of proof of *scienter* by such dealings."

In this case the claim made by the declaration was that during the years 1876, '77, '78, and '79 these defendants were engaged in a series of transactions, one following closely upon the other, putting off upon the plaintiff certain mortgages upon lands which were utterly worthless, and known to be so by the defendants, and thus fraudulently obtaining from the plaintiff large sums of money. The proofs introduced tended strongly to show the truth of the matters alleged. Though not charged in the declaration as a conspiracy, the point of fact that it was a conspiracy might be proved, and, as we have before said, if the testimony of plaintiff and her witnesses was to be believed, the defendants did conspire with these other persons to defraud her; and while they were carrying on these very transactions the McCarl case arises, similar in all respects as the transactions with the plaintiff. We think the testimony of McCarl and Keith was competent as proof of *scienter*, under the ruling of this Court in *Beebe v. Knapp*, 28 Mich. 53. In that case this Court said:

"It is conceded by counsel for the plaintiff in error that in actions involving alleged fraud, when the knowledge and intent of the defendant is a material fact, evidence may be received of similar acts which happened shortly before or after, and which had no direct or apparent connection with the principal transaction; and where the question is whether a purchaser of goods procured them through fraud, distinct purchases made by him under similar circumstances, at or about the same time, and when the like motive may be reasonably supposed to have operated, are admissible in evidence with a view to the *quo animo*."

These defendants had made Turner, Tubbs, and Bathrick their tools in carrying out the Bathrick transactions, and had

used Ditmer and Wean in the other. The question before the jury was, were these things true which plaintiff claimed; had the defendants knowledge of the fact that all these lands were worthless, and the mortgages and notes no better than blank paper upon which they were written? We think the McCarl case was competent to show them engaged in a similar transaction with other parties about that time for the purpose of showing their fraudulent intent. This doctrine is fully sustained in the following cases: *Pomeroy v. Bailey,* 43 N. H. 125; *Hall v. Naylor,* 18 N. Y. 588; *Olmsted v. Hotailing,* 1 Hill, 317; *Castle v. Bullard,* 23 How. 172; *Lincoln v. Claflin,* 7 Wall. 132.

In *Eastman v. Premo,* 49 Vt. 355, the court said:

" The plaintiff, on the trial, offered testimony to show that the defendant was engaged in other transactions in horses contemporaneous with this, which were fraudulent, for the purpose of sustaining the plaintiff's claim that the defendant purchased the plaintiff's horse with fraudulent intent of getting possession thereof, and not paying for him."

This evidence was received, and the court held it competent "for the purpose of showing the defendant's intent."

We find no error in the record, and the judgment is affirmed, with costs.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.