### PEOPLE *v.* ASCHER.

1. HOMICIDE—MOTIVE—EVIDENCE.

On a trial for murder, it appeared that respondent had assumed to be a spiritualistic medium, and had induced deceased to make and wear a certain belt, containing gold coins, for the purpose of "developing power as a medium," and that deceased, when found, was without such belt and coins, and his clothing was in a condition indicating that the belt had been torn from his body. *Held*, that it was competent for the people to show that respondent was dishonest in his dealings with deceased, and intended to obtain his money by false pretenses; and to that end evidence that respondent had assumed to be a medium on former occasions, and had induced others to wear such belts and gold coins, and had once substituted nickels for the gold by sleight of hand, was admissible.

2. SAME—DISTINCT OFFENSES.

Respondent on a trial for murder testified that he had been arrested on a previous occasion for another murder, but had been discharged on the examination. *Held*, that it was error to permit the prosecution, on rebuttal, to go into the details of the alleged offense, and to urge that respondent was guilty of murder on that occasion.

3. CRIMINAL LAW—TRIAL—CONDUCT OF COUNSEL.

While intemperate argument by the prosecutor in a criminal case may frequently be attributed to the improper conduct of respondent's counsel, it is always better to rely on the trial court to correct any abuse of privilege by counsel than to attempt to retort in kind.

Error to recorder's court of Detroit; Murphy, J. Submitted February 15, 1901. Decided May 21, 1901.

Edward Ascher was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson. Reversed.

*George F. Monaghan,* for appellant.

*Allan H. Frazer,* Prosecuting Attorney, for the people.

MONTGOMERY, C. J. The respondent was convicted of murder in the first degree. The facts upon which the prosecution was based, as claimed by the prosecution, were as follows: Valmore C. Nichols was a farmer, aged 49 years, residing on a farm near Ypsilanti, in Washtenaw county, this State. At the time of his murder his family there consisted of his wife and grown-up daughter. He became interested in the subject of spiritualism, and in 1898 undertook to make an investigation into its teachings. To that end, in the month of February he came to Detroit to talk with an alleged medium named Donovan, located at 124 Lafayette avenue, corner of First street. Mr. Nichols did not see Donovan, but fell in conversation at the place above named with a man who called himself Robert Lang, and who claimed to be a medium. Their conversation led to relations between them which went on from that time, periodically, until Valmore C. Nichols was murdered, on the evening of the 10th day of August, 1898, his person robbed, and his body thrown into Detroit river. The first that was known of his death was on the 18th day of August, 1898, when some boatmen, rowing about for pleasure in the vicinity of the Detroit Boat Club House, in the American channel, at Belle Isle, discovered a body 200 yards from shore, and 300 yards above the Detroit Boat Club House. The water at this point was not very deep. The people who discovered the body called for assistance and got the

body ashore, when it appeared that the body was fully dressed, and attached to the feet were two large stones, bound around with copper wire, and the rest of the copper wire was wound around the legs of the deceased. The top button of the coat was buttoned, his vest and pants were open, and his shirt was pulled up. There was no money on his person, but his gold watch and chain were there, and a pair of eyeglasses, some other personal effects, and two ticket stubs, good for the return trip from Belle Isle to Detroit for the date stamped on them, which date was the 10th day of August, 1898. Nichols never told his wife of the gold belt, but she felt the money in it, and Ascher said he never told any one about the gold in Nichols' belt. There was a mark on the head, where he had been struck with some blunt instrument; and an examination of the contents of the stomach by Dr. Samuel P. Duffield, of Dearborn, an expert chemist, revealed the fact, as he testified, that he had received a dose of arsenic, although upon this point the testimony was in conflict.

Alice Nichols, wife of the deceased, testified that she saw him alive last on the 10th day of August, 1898, at about 10 o'clock in the morning, taking an electric car from Ypsilanti to Detroit. He never talked with her about his spiritualistic investigations, and with his family and friends and business acquaintances he was very secretive. From the fact that his clothes were open in front, and the shirt drawn up, and the condition in which his clothes were found after his death, it was claimed that the person who murdered him had done so to get possession of a cotton belt that he wore, into which were sewed 20 $20 gold pieces,—in all, $400 in gold,—which he wore about his person. It appeared that he was in the habit of coming periodically to Detroit and holding séances with the defendant, Edward Ascher, but who was known to Mr. Nichols by the name of Robert Lang, and who corresponded with Mr. Nichols under that name; that he commenced writing to him in May, 1898; that on June 10, 1898, Nichols received from Robert Lang a pair of 5-cent slates

through the express office, and for which Nichols paid Lang $10, as they were magnetized, according to Lang, and were part and parcel of the necessary equipment for Nichols to have, to be properly developed as a medium; and a letter which Lang sent to Nichols instructed him to use the slates Monday, Wednesday, and Saturday evenings for sittings, and to wear the gold belt all the time, and not to take it off, but to sew it in, and not pin it, but to wear it next to him.

On the 17th day of July, Lang wrote Nichols another letter, in which he told Nichols that he (Lang) felt that the gold was not strong enough, but that another medium could not do him any more good than he was doing. On the 25th day of June, Nichols made for himself a belt of muslin, which Mrs. Nichols swore that Mr. Nichols wore, and in which she felt money the size of 50-cent pieces. Afterwards, on the 3d day of August, a week before he was killed, he made a second belt, which he put on instead of the other, and that he had sewed on. On that same day (the 3d day of August) Mr. Nichols went to the Ypsilanti Savings Bank, where he did some business, and deposited $423.30, and got the bank to give him back in gold $420. Previously he had got from the bank on the 25th day of June $220 in gold, but returned it in gold on July 14th. This belt was on him when he left home at 10 o'clock on the morning of August 10, 1898. He took with him on that occasion a bunch of letters which Mrs. Nichols had seen in his writing desk, which letters were signed, "Robert Lang," and which Mr. Nichols had received in the due course of mail from Robert Lang. He brought those letters to Detroit on the 10th day of August, under instructions from the defendant.

After Mr. Nichols came to Detroit on the 10th day of August, he was at the house 124 Lafayette avenue, and was there until nearly 3 o'clock, in the presence and company of the defendant. He was next seen at the public boat house on Belle Isle at 7:45 o'clock in the evening. He at that hour receipted for boat No. 6, and paid for it 10 cents.

He was then in the company of another person. There was testimony tending to identify that person as the defendant, Edward Ascher. The boat went away with the two persons in it. The records of the boat house show that boat No. 6 came back at 8:50 o'clock with only one man in it, and that the smaller man. The smaller man left the boat about 50 feet away from the office, and, upon the boatman asking him what number it was, the smaller man, who brought the boat back, said it was No. 6, and went away from the boatman, in another direction, and he did not get a good look at the smaller man's face; but he testified that the smaller man, in size, was about the same as Ascher.

Edwin Hulbert reached the public boat house at 20 minutes to 8, and took notice of Mr. Valmore C. Nichols and his companion, who were getting the boat ahead of Mr. Hulbert. He identified Mr. Nichols, and described how he was dressed on that occasion. He described the person who accompanied Mr. Nichols as a good deal lighter build; dark-complexioned; wore a brown suit and a derby hat,— and that he had a dark mustache, and he saw them get in the boat, and saw them out on the water, and that, in size, complexion, and general appearance, Ascher resembled Nichols' companion. When Ascher was arrested, he wore a blue serge suit of clothes; and Hulbert, upon looking at him at the police station, informed the police that on the night of the murder the man who was with Nichols wore a brown suit. Upon going to Ascher's grip, it was found that he had a brown suit, and that the blue serge which he had on was purchased by him, under the name of E. Schultz, two days after the murder, August 12th, and that he paid $12 for the same, and the amount of money which he handed in for the suit was $20. Whether it was gold or not, there was no way of determining, after the lapse of time. He also went out to Island Lake, to the encampment, and, when he was arrested, $51 was taken off his person, so that after the murder he seemed to be well supplied with money,

although up to that time he had been wearing an old suit of clothes, where the pants were ragged and patched, on August 10th, and claiming that he had $150 before the murder, but borrowed $18 on Sunday before the murder to go to Island Lake. It also appears that this defendant bought arsenic at Cook's drug-store, on Michigan avenue, two days before the murder of Nichols. The drug clerk testified that, at the time Ascher bought the arsenic, he (Ascher) stated that he wanted it for a friend in Canada. Ascher admitted purchasing the arsenic as testified to by the drug clerk, but stated that he wanted to kill the fleas on a dog with it, but that he did not use it to kill the fleas; that he afterwards thought of another remedy, viz., tobacco. Although the defendant stated that upon Wednesday, the 10th day of August, he had not been on Belle Isle, still Abijah Whittemore, who had known Ascher since he was a boy, testified that he saw him on Belle Isle bridge, coming back from the island towards the city, about 10 or 12 minutes to 9 o'clock in the evening of the 10th of August.

The prosecution, under objection and exception, also introduced testimony tending to show that on two previous occasions the respondent had assumed to be a medium, and had advised his dupes to get a belt and get a considerable quantity of gold and place in it, with a view to developing power as a medium, and that on one occasion, by sleight of hand, he substituted nickels for gold pieces, and retained the gold. One of the important questions presented is whether this testimony is competent. It is contended by the prosecution that anything tending to show that Ascher was dealing dishonestly with Nichols, and attempting to get his money dishonestly, was admissible; that the prosecution could prove that Ascher was attempting to obtain Nichols' money by false pretenses; and that therefore proof of other false pretenses was admissible.

We have no doubt that respondent's dealings with Nichols were admissible as part of the *res gestæ*, and to

show knowledge that Nichols had the gold in his possession; and it was also competent for the prosecution to show, as bearing on the question of motive, that the accused was engaged in a scheme to defraud and obtain the money of Nichols by false pretenses. The question of fact, therefore, as to whether the accused was endeavoring to obtain this money by false pretenses, was triable as in any other cause. While the general rule is that proof of another distinct offense may not be given in evidence for the purpose of convincing the jury that it is more probable that the offense charged has been committed, an exception is made when a particular intent is to be proved; and it has been held in many cases that, where a charge of false pretenses is made, proof of similar false pretenses practiced upon others is admissible. *People* v. *Wakely*, 62 Mich. 297 (28 N. W. 871); *Bielschofsky* v. *People*, 60 N. Y. 616; *Cook* v. *Perry*, 43 Mich. 623 (5 N. W. 1054); *Stubly* v. *Beachboard*, 68 Mich. 401 (36 N. W. 192). See, also, *People* v. *Seaman*, 107 Mich. 348 (65 N. W. 203, 61 Am. St. Rep. 326), and cases cited; *Wallace* v. *State*, 41 Fla. 547 (26 South. 713). The testimony should in all cases be limited in its use to the purpose for which it is admitted.

The respondent, while on the stand as a witness in his own behalf, testified that on a previous occasion he was arrested for the murder of one Mrs. Kotz, and was discharged on examination. On rebuttal the prosecution was permitted to go into all the details of the alleged offense, and to urge before the jury that the accused had been guilty of murder on that occasion. Such testimony does not come within any exception to the general rule, and was inadmissible, and could not have failed to affect the rights of the respondent.

A large portion of the brief of counsel is taken up by a discussion of error alleged to have been committed in the argument of the prosecuting attorney. We need not consider whether there was error committed in this regard, as it is not likely that the question will again arise in the same

form, and as our previous rulings on the subject cannot well be misapprehended. We are not unmindful of the frequent unseemly attempts made by the defending counsel to direct attention from the main issue, and to put the prosecuting attorney and the people's witnesses on trial in place of the respondent, and it is perhaps not surprising that the prosecutor should at times retort in kind. The better practice, however, is to rely upon the trial court to correct any abuse of privilege by respondent's counsel.

For the error pointed out, the conviction will be reversed, and a new trial ordered.

The other Justices concurred.