STATE OF MINNESOTA v. THEODORE WILSON and Another.

June 9, 1898.

Nos. 11,196—(27).

Swindling by Device under G. S. 1894, § 6595—Padlock upon Sidewalk—Wager with Stranger—Pretended Arrest by Policeman.

W., C., and F. were confederates in swindling one Cook, which was committed substantially as follows: C., having struck up an acquaintance with Cook, proposed a walk, and while walking pretended to have found on the sidewalk a small padlock, which he exhibited to Cook, and showed him how it could be opened without a key by touching a secret spring. Subsequently they met W., a pretended stranger, to whom C. showed the lock, stating that he (W.) could not open it without a key. W. offered to bet $10 that he could. C. accepted the bet, and called Cook aside, saying: "I only got $5. * * * You throw in $5, and I will give it

back to you when we learn W. a lesson." Cook gave C. the $5, which, with $5 of his own, C. gave to W. While W. was pretending to be attempting to open the lock, F. came up, and, personating a policeman, and displaying a policeman's star on his coat, threatened to arrest them for gambling on the street. W. ran away with the money, and then F. arrested C. and Cook, and pretended to be taking them to the police station. On the way, F., having ascertained how much money Cook had, released him upon his paying him $50, and promising to leave the city. *Held*, that the $5 was obtained from Cook by means of a false token, trick, or device, within the meaning of G. S. 1894, § 6595, notwithstanding the fact that he did not join in the bet, and had at the time such confidence in C. that he would have let him have the money for a purpose other than betting on the lock.

Same—Evidence—Subsequent Acts.

Also, that it was competent to prove what happened after F. appeared on the scene, for the purpose, if no other, of characterizing what had preceded, the whole being all one transaction, and done in furtherance of the scheme to swindle Cook.

Same—Intent—Evidence of System—Successive Swindles.

Where the crime for which a defendant is being tried is one of a system of successive frauds or swindles of the same kind in which he had been engaged, it is competent for the state to prove that fact, as tending to prove a criminal intent.

Same—Evidence—Subsequent Possession of "Star."

It was also competent to prove that when C. was arrested, about two months after the commission of the offense, he had upon his person a policeman's star similar to the one worn and displayed by F.

Appeal by defendants from an order of the district court for Hennepin county, Smith, J., denying a motion for a new trial. Affirmed.

*T. A. Garrity,* for appellants.

*H. W. Childs,* Attorney General, and *Jas. A. Peterson,* County Attorney of Hennepin County, for respondent.

MITCHELL, J.

The defendants Wilson and Carlson were indicted, tried, and convicted, under G. S. 1894, § 6595, of the crime of swindling. The statute referred to reads in part as follows:

"Whoever by means of three-card monte, so called, or of any other form or device, sleight of hand or other means whatever, by use of cards or instruments of like character, or by any other instru-

ment, trick, or device, obtains from another person any money or other property of any description, shall be deemed guilty of the crime of swindling."

The evidence tends to prove substantially the following state of facts: The defendant Carlson struck up an acquaintance on the streets of Minneapolis with the complainant, Cook, who was a stranger from the country, and, after going into a saloon to get a drink, proposed to him to take a walk. While walking, Carlson stooped down, and pretended to have found on the sidewalk a small padlock, which he exhibited to Cook, and showed him how it could be opened without a key by pressing on a secret spring. After walking a short distance further, they were met by defendant Wilson, an apparent stranger, who asked for a match to light a cigar. This being furnished, Carlson showed Wilson the lock, and asked him if he could open it without a key. Wilson said he could, and offered to bet Carlson $10 that he could. Carlson accepted the bet, and then, calling Cook aside, said: "I only got $5. * * * You throw in $5, and I will give it back to you when we learn Wilson a lesson." Thereupon Cook gave Carlson the $5, and the latter handed it, with another $5 of his own, to Wilson.

While Wilson was pretending to be trying to open the lock, Furey (indicted jointly with Wilson and Carlson) came up, and, displaying a police star on his coat, pretended to arrest the parties for gambling on the streets. Wilson, who had the money, ran away, but Furey arrested Carlson and Cook, and pretended to be taking them to the police station. While on the way, after stating to them that gambling on the street was a serious offense, punishable by imprisonment in the penitentiary for one year or by a fine of $500, he asked them how much money they had. Cook said he had about $60. Carlson said he had no money, but had a check for $50. Furey proposed to let them go if they would give him the check and the money, and leave the city. They gave him the check and money, whereupon Furey returned Cook $10 to pay his fare to his home in Dakota, released him and Carlson, started them in opposite directions, and told them to leave town. It is needless to say that Carlson, Wilson, and Furey were old acquaintances, and, as the evidence tends to show, confederates in the business of swindling.

Upon cross-examination Cook testified that he did not expect to make anything out of the bet, that he simply gave Carlson the $5 as a favor, and that he would as readily have given it to him for any other purpose, as he supposed at the time that he (Carlson) was "all right." The point is made that, while these facts might amount to obtaining money by false pretenses or by duress, they do not constitute the crime of swindling by the means described in the statute; that neither the $5 nor the $50 were obtained by means of the lock, or any other form or device, within the meaning of the statute.

The object of the statute was, doubtless, to codify, and at the same time to expand, the common law on the subject of "cheats." To constitute a common-law cheat, the money or property must have been obtained by means of some false token, symbol, or device, as distinguished from mere words, however false and fraudulent. As the act of obtaining goods by false pretenses is made indictable by another section (6709), it must be held that, to constitute the crime of swindling, the property must have been obtained by some false token or device other than mere words.

In this case the padlock, displaying the secret spring to the intended victim, and getting up the sham bet, were the device by which the defendants obtained the complainant's money, although it might have been asked for under the guise of a loan to Carlson to enable him to bet. This amounted to more than mere words constituting false pretenses, and constituted a false device, within the meaning of the statute. It was not necessary, in order to constitute the offense charged, that Cook should have himself made, or joined in, the bet. Notwithstanding what Cook was brought to say on cross-examination, all the circumstances tend to prove that he was induced to part with his money through his "confidence in the device"; that is, that Wilson would be unable to open the lock, and hence that Carlson would win the bet.

If the $5 were obtained by a false token or device, the offense charged was complete, without regard to the $50 subsequently obtained by Furey, the bogus policeman. The latter sum was withdrawn by the court from the consideration of the jury, and hence need not be considered, although we are of the opinion that it also

was obtained by a false token or device. A false personation—that is, a man's calling himself by a false name—was not, at common law, and probably is not under the statute, a false token or device; but wearing and exhibiting a police star as a means of passing himself off as police officer is such a token or device; and it was by means of this, and the supposed official authority of the wearer, that the $50 were obtained.

2. It is next contended that the court erred in receiving evidence of what occurred after Furey came on the scene, for the reason that the crime, if any, was already consummated, and what followed merely tended to prove the separate crime of extortion. There is no merit in this point. The evidence tended to prove almost conclusively that Carlson, Wilson, and Furey were confederated together for the common purpose of swindling Cook, and that all that was done from start to finish was done in furtherance of that purpose, and was all planned and contemplated from the beginning. It was all one transaction, and what occurred after Furey came up was competent for the purpose, if no other, of characterizing what had preceded.

3. Furey was present at the trial, and was positively identified by Cook as the man who participated in the swindle. The witness Johnson testified that Carlson, Wilson, and a man named Furey were in the habit of meeting in the saloon in which the witness was barkeeper; that this Furey in some respects resembled the man in court, but in other respects seemed to differ in appearance; that the witness could not swear that he was the same man; that it might be a brother; that the witness remembered the occasion of Carlson and Cook coming into the saloon for a drink; that Wilson and Furey were in the back part of the saloon at that time; that very soon after Carlson and Cook went out at the front door Wilson and Furey went out at the side door, and stood watching them going up Seventh avenue as far as Third street, and then started and followed them.

The witness, after stating that he had seen Carlson, Wilson, and Furey in the saloon together before that, was permitted to testify, under defendants' objection and exception, that he heard a conversation between them, in which Furey said to the other two, "Go

out and get a guy." It does not appear from the record when this occurred except that it was prior to the time that Carlson and Cook came into the saloon. The bill of exceptions does not purport to contain all the evidence introduced on the trial, or all that was introduced upon any particular issue or fact. Hence, for anything that appears, this conversation might have occurred on the same day, and immediately preceding the commission of the offense charged, so as to be really a part of the same transaction. But the evidence was admissible on broader grounds. Whatever may be said as to the identity of Furey, there was no question as to the identity of Carlson and Wilson. The conversation testified to was not a statement or admission made by Furey in their absence, but one made in their presence, and addressed to them in the course of a conversation between the three. There is no room for misunderstanding what the suggestion that they "go out and get a guy" meant. It tended to prove that the three, whoever the third may have been, were engaged in the business of swindling green or unsophisticated persons, called, in their vernacular, "guys."

The general rule is that, when offered simply for the purpose of proving a defendant's commission of the offense charged, evidence of his commission of other independent crimes is inadmissible. But there are exceptions, or rather apparent exceptions, to this rule. One of these is where the crime in question is one of a system of similar crimes in the commission of which the defendant is habitually engaged. This exception is particularly applicable to cases where the defendant is engaged in the commission of a system of successive frauds of the same kind; as, for example, a system of successive forgeries or of successive cheats or swindles of the same general nature. It is therefore competent to show that the defendant had been engaged in practicing like or similar cheats, as tending to prove a criminal intent.

4. When Carlson was arrested, about two months after the commission of the offense charged, there was found on his person a police star similar to the one worn by Furey at the time he personated a policeman, and assumed to arrest Cook and Carlson. It was competent for the state to prove this fact, notwithstanding the lapse of time and the fact that it was impossible to show that the

star found on Carlson was the identical one displayed by Furey. The weight of the evidence was for the jury.

The points raised by the remaining assignments of error are not of sufficient importance to require any consideration beyond stating that we are of opinion that they are without merit.

Order affirmed.