PEOPLE *v.* RICE.

1. CRIMINAL LAW —INFORMATION — EVIDENCE BEFORE EXAMINING MAGISTRATE—ADMISSIBILITY.

An information will not be quashed because of the admission of incompetent evidence by the examining magistrate, where there is sufficient competent evidence to establish the commission of the offense by the defendant.

2. SAME.

Evidence *held,* sufficient to justify the examining magistrate in holding defendant for trial; it not being necessary to establish his guilt beyond a reasonable doubt.

3. SAME—FALSE PRETENSES—INFORMATION—SUFFICIENCY.

In a prosecution for obtaining money by false pretenses, where the information alleged that the false representations, by means of which a check was obtained, were made to the Excelsior Wrapper Company, the party defrauded, it was not defective for failure to allege that the person sending the check was an agent of the company.

For authorities passing on the question of evidence of other crimes in criminal cases, see notes in 62 L. R. A. 193, 222, 240, 323; 43 L. R. A. (N. S.) 667.

On reliance on false pretenses as an element of the offense, see note in 6 L. R. A. (N. S.) 365.

For improper evidence as grounds for quashing an indictment, see note in 47 L. R. A. (N. S.) 1207.

4. SAME—FALSE PRETENSES—INTENT NECESSARY ELEMENT.
   Intent to defraud is a necessary element of the offense of obtaining money by false pretenses.

5. SAME—EVIDENCE—OTHER SIMILAR OFFENSES—INTENT.
   While, in a prosecution for felony, it is the general rule that evidence tending to establish the guilt of defendant of another distinct and independent crime, is not admissible, yet an exception to the general rule is made where the question of intent is of vital importance, in which case such evidence is admissible to prove intent.

6. SAME—EVIDENCE OF SUBSEQUENT SIMILAR OFFENSES—INTENT.
   Evidence as to similar transactions between the same parties occurring both before and after the obtaining of the check on false pretenses charged in the information, held, admissible for the purpose of proving intent to cheat and defraud, since the probabilities of an honest mistake diminish as the number of similar transactions, indicating a scheme or system, increases.

7. SAME—TRIAL—INSTRUCTIONS.
   Held, that the trial judge, by appropriate instructions, carefully guarded its use and limited the purpose for which said evidence was received.

8. SAME—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.
   There being an abundance of testimony to take the case to the jury, the court below properly refused to direct a verdict for defendant.

Error to superior court of Grand Rapids; Dunham, J. Submitted June 12, 1919. (Docket No. 99.) Decided July 17, 1919.

Fred C. Rice was convicted of obtaining money by false pretenses, and sentenced to imprisonment for not less than 4 nor more than 15 years in the State prison at Jackson. Affirmed.

*Lillie, Lillie & Lillie* and *O. Y. Rossiter*, for appellant.

*Cornelius Hoffius*, Prosecuting Attorney (*Fred P. Geib*, of counsel), for the people.

FELLOWS, J.   The Excelsior Wrapper Company, hereafter called "the company," is a Michigan corporation located at Grand Rapids, and is engaged in manufacturing excelsior, excelsior wrapping pads, etc. In the year 1913 it entered into business relations with Fred C. Rice, the defendant, who resided at Traverse City.   Stated briefly, the arrangements were that the company agreed to purchase of Rice poplar and basswood bolts at an agreed price; the company was to advance to Rice $5 per cord on the bolts when and as he advised it he had purchased the same, or, as stated by some of the testimony, as he had the same reported to him.   The bolts were quite largely, if not entirely, green when purchased and were not to be shipped to the company until they were seasoned. This took from a year to a year and a half.   When seasoned and shipped the company gave Rice his proper credit.   The business done was considerable, and in the spring of 1917 the company had advanced over $18,000 to Rice beyond the amount of bolts received at its plant.   It fairly appears that the winter preceding had been a difficult one to get bolts out of the woods and to the railroad, and a shortage of shipping facilities seemed imminent.   The company was anxious to get stock to keep its plant running and requested a report of the amount of bolts on hand.   In answer to this request the defendant on March 4th wrote the following letter:

"3/4/17.
"EXCELSIOR WRAPPER CO.,
      "Grand Rapids, Mich.
   "*Gentlemen:* As per your phone request of yesterday, I beg to report the following stock of bolts at various stations.   In round figures 2,400 cords of dry and partly dry stock.   About 1,000 cds. of cut green stock and some 1,200 cds. cutting jobs not yet completed, on which no funds other than 50 cents stumpage has been advanced.
                  "Yours truly,
                              "F. C. RICE."

On May 18th defendant wrote the company a letter which contained the following:

"Have reported 55 cords peeled bolts on which an advance of $275 is requested."

A check for the amount of the bolts reported, $275, was sent by the company to Mr. Rice. Comparatively few bolts were shipped by the defendant to the company during the spring and summer of 1917, and in September the company sent a man to check up the bolts on hand at the various stations from which defendant shipped. At some of the stations a few bolts were found, at others none, and defendant admitted that he had misapplied the funds, that he had made a mistake and was sorry for it and that he knew they could put him in jail for it. There was testimony in the case that during this month a conference was had in Grand Rapids at which defendant admitted his shortage. We quote from the testimony of the witness William E. Tallmadge:

"I asked him, I said: 'Do you mean to say that you have been sending in statements here and requesting us to send you money in payment of bolts that you have been collecting the last few months, and those reports are false, that you have been getting your money to buy bolts?' He said, 'Yes.' He said, 'I have been lying about it right along.' I said, 'Then you have not been buying any bolts lately?' He said, 'No.' Then I asked him what he was using that money for. 'Well,' he said, 'I have been using it for other things.' I said, 'You are in the automobile business.' He said, 'Yes.' I said, 'How have you been getting along with that?' 'Well, at first, I hoped to make enough out of that business so as to square up with the Excelsior Wrapper Company.' I asked him, I said, 'Mr. Rice, do you realize the position that you have placed Mr. Meves in. Do you realize that through your treatment of him and the Excelsior Wrapper Company that he is liable to lose his position and ruin his future.' He said, 'Yes, and that is what makes me feel so

badly, because E. A. has been so square with me right along and this thing has worried me for a good many months.' I said to him, 'Then, when did you begin using the company's money for other things.' 'Well, soon after you commenced sending me checks.' I said, 'That long, early in 1913, you began using the company's money for other things than buying bolts?' He said, 'Yes, I have done that right along from that time up to the time we quit sending him checks, I have been pursuing that policy.' He said, 'That is exactly it, and I am glad and willing to take any punishment I deserve, go to Jackson and pound stone or anything else.'"

The defendant was arrested charged with obtaining the check for $275 by false pretenses; upon preliminary examination he was held to trial in the superior court of Grand Rapids, where an information was filed setting up quite fully the dealings of the parties, charged the making of the representations in the letter of March 4th and that they were false, the making of the representations contained in the letter of May 18th that he had reported 55 cords of peeled bolts and its falsity and the obtaining of the check for $275 by means of such false representations. A motion was made to quash the information which was refused and a trial resulted in defendant's conviction.

The principal grounds upon which defendant sought an order quashing the information and here urged as basis of assignments of error upon the refusal to grant such order are that the examining magistrate received improper testimony and that the testimony produced before him did not establish the commission of the offense and probable cause. The objected testimony consisted of portions of the examination of the defendant before the referee in bankruptcy in proceedings in which he was adjudged a bankrupt. It is not claimed by the prosecution that such testimony was admissible and it was not offered upon the trial. An

information will not be quashed because of the admission of incompetent evidence where there is sufficient competent evidence to establish the commission of the offense by the defendant. *People* v. *Lauder,* 82 Mich. 109; *People* v. *Lay,* 193 Mich. 17 (L. R. A. 1917B, 608). It is not necessary to establish the guilt of the defendant beyond a reasonable doubt before the examining magistrate. While in the instant case the evidence before the magistrate of the defendant's confession was not as full as that given upon the trial we think there was sufficient of it taken in connection with the testimony of the transaction and the dealings of the parties to justify the examining magistrate in holding defendant for trial and that the motion to quash on this ground was properly refused.

We do not think the information defective within the holdings of this court in the case of *People* v. *Behee,* 90 Mich. 356. In that case the information alleged the obtaining of $5, the property of the Detroit Stove Works, by means of certain representations to Mr. Barbour. There was no allegation that he was the agent of the company or had any control over the money of the company or what relation he bore to the company. Without such allegations or some allegation connecting him with the company and its funds it was held that the information was not sufficient. In the instant case the representations were alleged to have been made to the company, not to a third person. The information was not defective in this regard.

We have examined the numerous assignments of error upon the admission of testimony and discover no reversible error. Except the question we shall now consider, they do not require consideration. The prosecution was permitted to introduce proof of similar transactions occurring both before and after the obtaining of the check for $275 for the purpose of show-

ing intent, and the court instructed the jury that such testimony might be considered by them for that purpose. By objections to receiving such testimony, motion to strike it out and assignments of error on the charge, defendant raises the question of the admissibility of such evidence, particular stress being laid upon the evidence of subsequent transactions, such subsequent transactions having occurred shortly after the obtaining of the $275 check, and in which defendant made similar representations and received checks thereon. This is the important question in the case and we approach it with no inclination to differ from the claim of defendant's counsel that the precise question here involved has not been adjudicated by this court. Our attention has not been challenged in the brief of either counsel to a decision of this court exactly in point. We must have in mind the character of the charge and the question as presented upon the record in the consideration of this question. The defendant stands charged in the information with making certain false and fraudulent representations with intent to cheat and defraud the company. The intent to defraud is a necessary element of the offense. Although the representations were false, if they were made honestly through mistake or otherwise without such intent there could not be a conviction. It was the claim and theory of the prosecution that they were made with such intent, that they were a part of a system or scheme to defraud the company.

The general rule is well established and is recognized in this jurisdiction that upon trial for felony the prosecution will not be permitted to give evidence tending to establish the guilt of defendant of another distinct and independent crime. But this rule has its exceptions; and it is not contended and cannot be contended that this court has not recognized that excep-

tions to this rule must obtain; and where this offense is involved, with the question of intent of vital importance, this court has held that evidence of similar transactions before the one charged are admissible to prove intent. *People* v. *Henssler,* 48 Mich. 49; *People* v. *Wakely,* 62 Mich. 297; *People* v. *Summers,* 115 Mich. 537. Does this exception also permit the introduction of evidence of subsequent similar acts, occurring shortly after the one charged and a part of the same system or scheme for the like purpose of proving intent? We think that upon reason and authority this question must be answered in the affirmative. The underlying reason for the exception lies in the fact that a man may be honestly mistaken, have no fraudulent intent if the transaction stands alone, is single; but that the probabilities of an honest mistake diminish as the number of similar transactions indicating a scheme or system increases. Thus a man may honestly offer a counterfeit bill, and the one transaction standing alone has little force in proving guilty knowledge, in proving intent to defraud. But if he successively offers 5 or 25 counterfeit bills, as such offers increase in number the probabilities of an honest mistake diminish, and the probabilities of guilty knowledge, of intent to cheat, increase. As was said by Lord Coleridge in *Reg.* v. *Francis,* 12 Cox Cr. Cas. 612:

"It seems clear upon principle that, when the fact of the prisoner having done the thing charged is proved, and the only remaining question is whether, at the time he did it, he had guilty knowledge of the quality of his act, or acted under a mistake, evidence of the class received must be admissible. It tends to show that he had been pursuing a course of similar acts, and thereby it raises a presumption that he was not acting under a mistake. It is not conclusive; for a man may be many times under a similar mistake or may be many times the dupe of another. But it is

less likely he should be so oftener than once, and every circumstance which shows that he was not under a mistake on any one of these occasions strengthens the presumption that he was not on the last."

The reason for the exception being as stated we perceive no ground of distinction between similar transactions occurring shortly before and those occurring shortly after the offense charged where they are part of a system or scheme to cheat and defraud. It is stated by Mr. Greenleaf in his work on Evidence (3 Greenleaf on Evidence [16th Ed.], § 15):

"In the proof of intention, it is not always necessary that the evidence should apply directly to the particular act, with the commission of which the party is charged; for the unlawful intent in the particular case may well be inferred from a similar intent, proved to have existed in other transactions done before or after that time."

Mr. Wigmore thus summarized the rule (1 Wigmore on Evidence, § 320, page 408):

"Subsequent representations are equally admissible with prior ones; because, on the principle of intent it is the repetition of them that is significant, and a subsequent instance reduces the probability of innocence equally as well as a prior one."

And in 1 Wharton on Criminal Evidence (10th Ed.), § 39, with citations of sustaining authorities, is found the following:

"When the object is to show system, subsequent as well as prior collateral offenses can be put in evidence, and from such system identity or intent can often be shown. The question is one of induction, and the larger the number of consistent facts, the more complete the induction is. The time of the collateral facts is immaterial, provided they are close enough together to indicate that they are a part of the system. In order to prove purpose and design, evidence of system is relevant; and in order to prove system, collateral

and isolated offenses are admissible from which system may be inferred. Or, where crimes are so mutually connected or interdependent that the proof of one is not coherent without evidence of the other. But to be admissible as relevant under system, the collateral, extraneous, or independent offense must be one that forms a link in the chain of circumstances and is directly connected with the charge on trial."

In considering the subject of false pretenses it is said in 19 Cyc. at page 443:

"Evidence of similar false representations made by defendant to the same person for the purpose of obtaining property, or to others shortly before or after the representations for which defendant is on trial, is in most jurisdictions held admissible to prove either defendant's knowledge of their falsity or a guilty intent or both, and this is so even though the transactions differ in detail, if similar in general outline."

In 4 Elliott on Evidence, § 2976, it is said:

"Evidence of similar offenses, involving the making of other false representations within reasonable limits as to time and circumstances, whether before or after the time in question and whether to the same person or to others, is admissible against the defendant to show that he was aware of the falsity of the statements made by him in the instance in question, and that, knowing them to be false, he made them with the intent to deceive."

In the case of *State* v. *Marshall*, 77 Vt. 262 (59 Atl. 916), defendant was informed against for fraudulently obtaining a bank check by falsely personating another. The court speaking through Mr. Justice Start said:

"Where the issue is the fraud or innocence of one in doing an act having the effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same subject-matter; and when several crimes form a part of one entire transaction and have some connection with each

other, as a part of the same plan or induced by the same motive, they may be shown to reduce the probability of innocence; and for this purpose, subsequent representations are equally admissible with prior ones, for it is the repetition of them that is significant, and a subsequent instance reduces the probability of innocence equally as well as a prior one, and the criminality of prior or subsequent acts or representations does not affect their admissibility, if they are otherwise relevant."

The case of *Commonwealth* v. *Lubinsky*, 182 Mass. 142 (64 N. E. 966), was a false pretense case. It was said in the opinion:

"As bearing upon the intent with which the defendant obtained the goods from Walkowich, it was competent for the government to show, if it could, that the goods were obtained by the defendant pursuant to a general or common plan or scheme of fraud on his part. And for the purpose of showing such a plan or scheme it was competent for the government to introduce testimony tending to show that at or about the same time he fraudulently obtained goods from other parties by the same or similar pretenses which he appropriated to his own use and for which he did not pay. The different transactions must be connected with the one in question as parts of a general or common scheme or plan to defraud in order to justify their admission as evidence. But when so connected the evidence of fraud which they furnish is competent as bearing upon the intent with which the goods were obtained in any one of the transactions embraced in the general plan or scheme. *Commonwealth* v. *Drew*, 153 Mass. 588 (27 N. E. 593); *Commonwealth* v. *Robinson*, 146 Mass. 571 (16 N. E. 452); *Commonwealth* v. *Tuckerman*, 10 Gray (Mass.), 173, 197; *Jordan* v. *Osgood*, 109 Mass. 457. The fact that the evidence might also be admissible to prove the commission of other crimes did not render it incompetent for the purpose for which it was admitted."

The exception is more broadly stated by Justice Story in *Bottomley* v. *United States*, 1 Story, 135, than is necessary for us to adopt. He says:

"In most cases of conspiracy and fraud, the question of intent, or purpose, or design in the act done, whether innocent or illegal, whether honest or fraudulent, rarely admits of direct and positive proof; but it is to be deduced from various circumstances of more or less stringency, and often occurring, not merely between the same parties, but between the party charged with the conspiracy or fraud and third persons. And in all cases, where the guilt of the party depends upon the intent, purpose, or design, with which the act is done, or upon his guilty knowledge thereof, I understand it to be a general rule, that collateral facts may be examined into, in which he bore a part, for the purpose of establishing such guilty intent, design, purpose, or knowledge."

In *State* v. *Wilson,* 72 Minn. 522 (75 N. W. 715), it was said:

"The general rule is that, when offered simply for the purpose of proving a defendant's commission of the offense charged, evidence of his commission of other independent crimes is inadmissible. But there are exceptions, or rather apparent exceptions, to this rule. One of these is where the crime in question is one of a system of similar crimes in the commission of which the defendant is habitually engaged. This exception is particularly applicable to cases where the defendant is engaged in the commission of a system of successive frauds of the same kind; as, for example, a system of successive forgeries or of successive cheats or swindles of the same general nature. It is therefore competent to show that the defendant had been engaged in practicing like or similar cheats, as tending to prove a criminal intent."

In the case of *State* v. *Brady,* 100 Iowa, 191 (69 N. W. 290), a case cited and quoted from by this court in *People* v. *Hoffmann,* 142 Mich. 531, the defendant was overseer of the poor at Ottumwa. He was indicted for cheating by false pretenses. The offense alleged in the indictment occurred on or about July 11, 1893. It grew out of the filing of a claim for three dollars

pretended by the defendant to be for transportation furnished a woman and three little children. Upon the trial the prosecution was permitted to introduce all the claims presented by the defendant during the year of 1893, upwards of 500 in number and aggregating upwards of $1,400. In the *Hoffmann Case* we quoted from the Iowa case the following:

"It seems to us that the evidence was also admissible for the purpose of proving a systematic scheme or plan on the part of the defendant to cheat and defraud the county, thus negativing the idea that the presentation of the claim in question was accidental, or through oversight, or mistake. * * * The jury may well have found, from the evidence complained of, that the filing of the claim, and the receipt of the warrant charged in the indictment, was a part of a plan or scheme adopted by the defendant to cheat and rob the county. For this purpose, as well as for the purpose of establishing the defendant's knowledge of the falsity of the claim, the evidence was admissible."

In the *Hoffmann Case* the charge was obtaining money from the State by false pretenses. The amount obtained, $56.34, was procured by the defendant, then coroner of the county of Wayne, by means of a bill for alleged services of himself as coroner and for other alleged expenses growing out of the violent death of one Mrs. Josephine Summers, who was represented by him to be a stranger although a resident of the city of Detroit. This was the specific offense charged in the information. Upon the trial some 40 bills or vouchers of the defendant upon similar blanks used in the Summers case and upon which defendant procured various sums from the State were received in evidence; there was also received evidence tending to show the falsity of the representations contained in these various bills or vouchers; the circumstances were similar to those in the Summers case and tended to show a system to defraud. This court there fully

considered the admissibility of such proof and affirmed the conviction. An examination of the record in that case discloses that the dates of the various bills do not appear, and it is not established by the record whether they were before or after the Summers case.

In the case of *People* v. *Seaman*, 107 Mich. 348, the charge was manslaughter by abortion. Evidence of other criminal operations was received. In considering the cases dealing with the admissibility of this class of testimony it was said:

"Some of these authorities would seem to be border cases, but they illustrate the tendency of the courts to allow the introduction of this class of testimony to repel the inference that the cause was an accidental one, in cases where such an inference might otherwise obtain. Upon principle and authority, it is clear that where a felonious intent is an essential ingredient of the crime charged, and the act done is claimed to have been innocently or accidentally done, or by mistake, or when the result is claimed to have followed an act lawfully done for a legitimate purpose, or where there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result, as tending to show guilty knowledge, and the intent or purpose with which the particular act was done, and to rebut the presumption that might otherwise obtain."

See, also, *State* v. *Merry*, 20 N. D. 337 (127 N. W. 83); *State* v. *Walton*, 114 N. C. 783 (18 S. E. 945); *Kramer* v. *Commonwealth*, 87 Pa. St. 299; *Penn. Mut. Life Ins. Co.* v. *Trust Co.*, 19 C. C. A. 286 (72 Fed. 413); *Wood* v. *United States*, 16 Pet. (U. S.) 342; *State* v. *Rosenberg*, 162 Mo. 358 (62 S. W. 435, 982); *Carnell* v. *State*, 85 Md. 1 (36 Atl. 117); *Queen* v. *Hamilton*, 1 Cox Cr. Cas. 244; *Reg.* v. *Dossett*, 2 C. & K. 306; *People* v. *Ascher*, 126 Mich. 637; citation and consideration of numerous other authorities will be found in *People* v. *Hoffmann*, supra, *People* v. *Sea-*

206—Mich.—42.

*man, supra,* and in *Trogdon* v. *Commonwealth*, 31 Grat. (Va.) 862. †

We conclude that the testimony of similar transactions subsequent to the date of the act alleged in the information was properly received. These transactions were shortly after that date, were of like character, between the same parties and were a part of the same system or scheme to defraud. When testimony of this character is received the trial judge should carefully guard its use by appropriate instructions, and limit the purpose for which it is received. This was done in the instant case.

The court properly overruled defendant's motion for a directed verdict. There was an abundance of testimony to take the case to the jury. Defendant's confession, the evidence of the man who went to the various stations from which defendant shipped bolts, and where bolts would have been found if defendant had purchased the bolts he claimed he had; the testimony of numerous parties from whom defendant purchased bolts that they had not sold him any bolts at approximately the time in question, the dealings and transactions of the parties all tended to establish the claim of the prosecution. The case of *People* v. *Perry*, 197 Mich. 47, is quite in point. It was there said:

"It has been held that proof of the falsity of the representation need not necessarily be direct; it is sufficient if the evidence establish facts tending legitimately to show its falsity. It is said that as defendant is usually in a position to know the truth or falsity of the representation, slight evidence of its falsity is sufficient for his conviction, in the absence of countervailing evidence of its truth."

We have examined the charge of the court and the defendant's requests to charge. The charge of the court was a fair one and fully protected the rights of the defendant; such of defendant's requests as he was

entitled to were given in substance in the general charge. We have been able to find no reversible error upon this record. The defendant has been given a fair trial.

His conviction is affirmed.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.