## PEOPLE *v*. CRAWFORD.

1. CRIMINAL LAW—INDORSING NAMES ON INFORMATION—CONTINU-ANCE—DISCRETION OF COURT.

   The granting of a motion for leave to indorse the names of additional witnesses on the information, and denial of defendant's motion for continuance of the case to allow opportunity to investigate the testimony of the newly indorsed witnesses, *held*, within the discretion of the trial court.

2. SAME—CONTINUANCE—ABUSE OF DISCRETION.

   Where six days' notice of the motion to indorse was given defendant's counsel, and of the three such witnesses sworn, the testimony of two was stricken from the record, and the only one whose testimony remained in the case was called by defendant for examination under the statute, it cannot be said that defendant was surprised, or that there was abuse of discretion in denying defendant's motion for a continuance.

3. SAME—BANKS AND BANKING—EMBEZZLEMENT—EVIDENCE — SUF-FICIENCY.

   In a prosecution of the cashier of a bank for embezzling funds of the bank under 2 Comp. Laws 1915, § 8027, evidence that defendant credited to a firm of which he was

On evidence of other crimes in prosecution for embezzlement, see notes in 62 L. R. A. 193, and 43 L. R. A. (N. S.) 226, 264.

a member the amount of two certificates of deposit which the maker of a note to the bank paid to him for the purpose of paying the note before it came due, which he was informed was in the hands of another bank as collateral, and therefore not surrendered to him, and which was carried on the books of the bank as a live asset, even after it was returned, *held*, sufficient to justify conviction; defendant's contention that he acted merely as agent of the maker in accepting the money to pay the note when it was returned being untenable.

4. SAME—PROOF OF SIMILAR TRANSACTIONS COMPETENT.
   Proof of similar transactions to show intent is competent in a criminal prosecution of a cashier on a charge of embezzling from the bank.

5. SAME—INTENT—TRIAL—INSTRUCTIONS.
   An instruction that "the law presumes that every man intends the consequences of his own act, and if knowingly and intentionally committed cannot be excused on the ground of innocent intent," *held*, when read in connection with the charge as an entirety, not misleading, although standing alone it might be questionable.

Exceptions before judgment from Gratiot; Hart (Ray), J., presiding.    Submitted January 13, 1922. (Docket No. 168.)    Decided March 30, 1922.

Alfred F. Crawford was convicted of embezzlement. Affirmed.

*William A. Bahlke* and *Archie McCall* (*George P. Stone*, of counsel), for appellant.

*Merlin Wiley*, Attorney General, and *O. L. Smith* and *J. E. Converse*, Assistants Attorney General, for the people.

STEERE, J.    The nature and story in outline of the crime for which defendant was tried and convicted may be best gathered from the body of the information which charges that on October 22, 1920,—

"he the said Alfred F. Crawford, being then and there

cashier of the First State Savings Bank of Brecken-
ridge, Michigan, as such cashier, did then and there
feloniously, wilfully and unlawfully embezzle, abstract
and misapply certain moneys, funds, credits and prop-
erty of said bank and owned by it, to wit, $2,000 law-
ful money of the United States of America of the value
of $2,000 lawful money of the United States of
America, said moneys, funds, credits and property hav-
ing been heretofore, to wit, on said 22d day of October,
A. D. 1920, delivered to said Alfred F. Crawford as
such cashier by one L. S. Morey in the form of two
certificates of deposit, issued by said bank to said L.
S. Morey for, to wit, the sums of $1,590 and $500,
respectively, in payment of a certain note given by
said L. S. Morey to said bank for $2,000 dated 3-12-20
and due on or before January 1st after date, with in-
terest at the rate of 7 per cent. per annum, after date
until paid, which moneys, funds, credits and property
said Alfred F. Crawford, as such cashier, then and
there accepted and received in such payment and
marked said note paid but failed to enter such payment
on the books, files and records of said bank, but
credited said moneys, funds and credits and property
to the private account of said Alfred F. Crawford and
one Orville G. Colthrop on the books, files and records
of said bank and which moneys, funds, credits and
property after being so credited to said account of
said Alfred F. Crawford and said Orville G. Colthrop
was by said Alfred F. Crawford then and there used
and converted to his own use and benefit, with intent
then and there to injure and defraud said bank and
said L. S. Morey and to deceive the officers of said
bank and the agent appointed to examine the affairs
of said bank contrary to the form of the statute in
such case made and provided, and against the peace
and dignity of the people of the State of Michigan."

The provided statute upon which the prosecution
relies is section 58 of the State banking laws (2 Comp.
Laws 1915, § 8027), which provides as follows:

"Every president, director, cashier, treasurer, tel-
ler, clerk or agent of any bank who embezzles,
abstracts or wilfully misapplies any of the moneys,
funds, credits or property of the bank, whether

owned by it or held in trust, or who, without
authority of the directors, issues or puts forth any
certificate of deposit, draws any order or bill of
exchange, makes any acceptance, assigns any note,
bond, draft, bill of exchange, mortgage, judgment or
decree, or who makes any false entry in any book, re-
port or statement of the bank, with intent in either
case to injure or defraud the bank, or any com-
pany, corporation or person or to deceive any officer
of the bank or any agent appointed to examine the af-
fairs of such bank, and any person who with like in-
tent aids or abets any officer, clerk or agent, in viola-
tion of this section, or who shall issue or cause to˙
be issued, or put in circulation, any bill, note or
other evidence of debt to circulate as money, upon
conviction thereof, shall be imprisoned in the State
prison."   *   *   *

Proof by the prosecution, unmet by contradicting
testimony, showed defendant Crawford was cashier of
the State Savings Bank of Breckenridge which had
been organized under the banking laws of this State
and was subject to examination by the banking de-
partment of Michigan.    Dr. Loren S. Morey was a
dentist located in Breckenridge, acquainted with Craw-
ford and a customer at said bank.    On March 12, 1920,
he negotiated a loan of $2,000 of said bank through
Crawford, giving his note to the bank for that amount,
due on or before January 1, 1921, secured by a cer-
tificate of deposit for $500 and a mortgage covering
property in Edmore, Michigan, for $1,500.    This mort-
gage ran until October 15, 1920, and he wanted the
bank to collect the same when it fell due.    Inquiring
at the bank on October 22, 1920, he learned from Craw-
ford that the mortgage had been paid, amounting with
interest to $1,590, and he then told Crawford he was
ready to pay the $2,000 note he owed the bank.    Dur-
ing the conversation Crawford passed to him the $500
certificate of deposit and another for the amount re-
ceived by the bank in payment of the Edmore mort-

gage, which the doctor pushed back saying he did not want those papers but wanted his note. Crawford then computed the interest due on the Morey note and subtracted the total from the sum of the two certificates of deposit which left a balance in Morey's favor of $26.50 and Crawford then handed him that amount in cash. When Morey asked for his note Crawford said he could not give it to him then as it had been used by the bank as collateral in borrowing money from outside and he would get it for him. When Morey was in the bank a week or ten days later Crawford told him the note was not back yet and he would touch them up, as they had given ample security in its place and it was returnable.

When in the bank somewhere near December 1, 1920, Morey inquired about his note of the assistant cashier, Mr. Colthrop, who replied he would touch them up again and get it as soon as possible, to which Morey said, "When you get it let me know by 'phone or hand it in to my office." On being answered by Colthrop that he would do so Morey made no further inquiry and dismissed the subject from his mind, having full confidence in the bank and Crawford's integrity as its cashier. It was shown by the records of the bank and Colthrop's testimony that Morey's $2,000 note to the First State Savings Bank of Breckenridge, given March 12, 1920, and paid in full at the bank to Crawford on October 22, 1920, had been on March 26, 1920, sent to the Second National Bank of Saginaw as collateral to a loan of the Breckenridge bank where it was held until January 22, 1921, when it was returned and stamped paid by Colthrop.

On October 22, 1920, when Morey paid his note at the Breckenridge bank to Crawford, the latter canceled Morey's two certificates of deposit and entered them as paid upon the bank's register of certificates of deposit and made out a deposit slip showing the pro-

218 Mich.—9.

ceeds, or money so paid him by Morey in liquidation of his note to the bank, deposited to the credit of the private account of Crawford & Colthrop, a partnership in which Crawford was personally interested. This account showed an overdraft of some $800 at the close of business the night before.

The bank had amongst its books the usual bank discount register for keeping a record of the number, name of payor, date, amount, etc., of every note taken by the bank. Morey's $2,000 note of March 12, 1920, was properly entered in the bank discount register but not charged off when paid, or later, and continued to be carried in that register as a live asset of the bank.

It was further shown by the prosecution that on January 31, 1921, two State bank examiners named Kalahar and Millard went to Breckenridge for the purpose of examining and auditing the books of the State Savings Bank located there, having been assigned to that duty in the regular routine of their employment by the State banking department. They remained there engaged in that work until about March 15, 1921. On arrival at the bank they found defendant Crawford in charge as its cashier with his assistant Colthrop present, and being received in the customary manner proceeded with their work. One of their first duties was to take charge of the note case containing the notes that belonged in the note balances and audit them. This note case Crawford produced and handed over to them as containing all the live notes which should be run in the note balances as assets of the bank, or if any were out for collateral a temporary record so showing. They then proceeded to list and total them on the adding machine, or "run them" as it is called. They found the total as compared with the note balance shown by the general ledger of the bank to be short $3,330 and called Crawford's attention to it, who with them checked over the notes and verified

their result. He then produced a receipt for six notes dated March 26, 1920, given by a Saginaw bank for some notes held as collateral for a loan to the Breckenridge bank showing a township of Wheeler order for $1,000 which he claimed should be counted in the live list notes and was credited on the note shortage by the examiners. Some time later he told them, "We have found $2,000 of that shortage." Asked "Where," said "The L. S. Morey note marked 'returned' is here in the bank and should have been placed back in the files." The Morey note was then handed to Kalahar who after examining it called Crawford's attention to the fact that it was stamped "paid" by the bank. Crawford then said that Colthrop had so stamped it in error and placed it with the dead notes. Kalahar then took the bank's discount register and found the entries in it pertaining to the Morey note showed it was yet alive and told Crawford it was not marked paid on the discount register, to which Crawford replied, "it wasn't marked paid on the discount register because it hadn't been paid." In reply to the inquiry of whether they should include it in the balance, total, of the live assets of the bank he answered, "Yes, you should." Kalahar so credited it and went on with his work; but the next day located Dr. Morey and interviewed him in his office, learning from Morey himself that he had paid the note at the bank to Crawford on October 22, 1920. After checking up and verifying payment of the Morey note from the records of the bank, as before indicated, he again interviewed Crawford with reference to it, called his attention to the deposit slip crediting the overdrawn account of Crawford & Colthrop with $2,063.50 on October 22, 1920, and said, "You deposited $2,063.50 to the Crawford & Colthrop account that day out of the certificates turned in by Mr. Morey, didn't you?" and Crawford replied that he did. Asked why he put the proceeds of the note in that account he re-

plied, "because that account needed the money." The amount was then charged by the bank examiners to the general shortage account and subsequently O. K.'d by Crawford in his own handwriting. Other claimed similar shortages of defendant Crawford were discovered by the bank examiners and proof of the same offered by the prosecution on the trial for the purpose of showing intent to defraud. Three of these were admitted in evidence for that purpose against defendant's objection, while objections were sustained as to others.

Six days before the case came on for trial a motion in due form was filed and notice thereof served upon counsel for leave to indorse the names of eight additional witnesses on the information. This motion and one to quash the information were argued together. The motion to quash the information was denied and defendant's counsel now concede in their brief that, in view of the prosecuting attorney's statement when arguing the motion that they would rely for conviction on the Morey transaction, "refusal of the court to quash the information was not prejudicial error."

On the motion for leave to indorse additional witnesses being granted, counsel for defendant moved for a continuance of the case to allow opportunity to investigate the testimony of the newly indorsed witnesses which the prosecution might introduce. This motion was denied. The granting of the motion for leave to indorse new names on the information and denial of the continuance are urged as prejudicial error. The motion for leave to indorse names of additional witnesses was in due form, and verified by an affidavit of the prosecuting attorney showing that he first learned their testimony was material to the issue to be tried on the afternoon of the day the motion was filed and served. Service was made upon opposing

counsel six days before the time of trial, accompanied by the prosecuting attorney's affidavit giving the names and residences of the proposed witnesses. All but one of these witnesses resided in Michigan, five of them in Breckenridge and two others not far away. Granting of this motion was within the discretion of the trial court; as was also the denial of defendant's motion for continuance. Only in case of a palpable abuse of discretion will a discretionary ruling be disturbed by a reviewing court.

As to the contention that it was an abuse of discretion to deny defendant's application for a continuance and force him to trial with no opportunity to investigate and prepare to meet the testimony of witnesses just indorsed, it first appears that six days' notice of the motion with names and addresses of witnesses was served upon defendant's counsel. The record further discloses that of those eight witnesses whose names were indorsed but three were sworn and the testimony of two of them was stricken out by the court and the jury directed to disregard the same. One of those two witnesses was the witness residing outside the State. The one whose testimony remained in the case was Ernest Muscott who resided in Breckenridge. He was not called by the people, but evidence was introduced by the prosecution, mostly from the bank records, to show a claimed similar transaction prior to the offense charged, which is called in the briefs of counsel "the Muscott transaction." In urging objection to that evidence counsel for defendant said in part, "We are entirely familiar with the transaction referred to and have our own explanation for it," and after the evidence was introduced called Muscott as a witness under the statute. It would scarcely seem that the defense was taken by surprise as to this witness, unless by the prosecutor's failure to call him.

The case had before been continued on defendant's motion, and under all the circumstances disclosed by this record we cannot conclude that the trial court committed an abuse of its discretionary power in denying defendant's motion for a continuance.

Of the situation presented by the evidence in relation to the Morey transaction on which this charge is based, counsel for defendant say in general:

"The respondent's position on the trial was and is that Dr. Morey left the money to pay the note with Mr. Crawford as a personal deposit and not as cashier."

A like contention to the effect that Crawford was agent of the customer of the bank, rather than of the bank in which he was then employed as cashier, is urged as to the claimed similar transactions of which proof was admitted, against defendant's objection, as bearing upon his intent in the offense charged.

Allied with the claim that Crawford was acting as Morey's agent for payment of the note he had given the bank when it should be returned, and did not accept or retain the certificates of deposit as payment, or as cashier of the bank, it is contended defendant's request for a directed verdict should have been granted for the reason that it appears without dispute Morey was fully advised the note was then elsewhere, hypothecated as collateral, and held "in due course" by another bank, and he then understood that the certificates of deposit which he left with Crawford were received and to be held for the purpose of paying the note when returned to the Breckenridge bank, and under the law of commercial paper the Saginaw bank with which the $2,000 note had been hypothecated was the *bona fide* holder of the paper in due course, and while so holding the only party legally entitled to receive payment thereon. To this counsel cite section 54 (2 Comp. Laws 1915, § 6093) of our negotiable instrument law defining a holder in due course, and

section 90 (§ 6129) defining payment in due course as follows:

"Payment is made in due course when it is made at or after the maturity of the instrument to the holder thereof in good faith and without notice that his title is defective."

There is abundant evidence, oral and written, to sustain a finding of the jury that on October 22, 1920, when Morey found his mortgage was paid at the bank, he told Crawford he wanted to, thought he had and, in fact, did pay the $2,000 note he had given the bank with money he then had on deposit there, and that Crawford as the bank's cashier accepted the certificates of deposit Morey pushed back to him for that purpose, paying him the difference in interest, canceling the certificates and transferring the fund so that, as between Morey and the bank, the note he had given it was paid in full.    That the bank could not deliver the note to him that day because held elsewhere as collateral would not invalidate its payment as between themselves.    The bank still owned the note.    The Saginaw bank only held a special interest in it as pledgee while the general property or ownership remained in the pledgor.    21 R. C. L. p. 640.

"Where a holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien."    2 Comp. Laws 1915, § 6068.

"The terms 'collateral security' and 'collateral' are used to designate a pledge of negotiable paper, shares of corporate stock or other incorporeal personalty, as distinguished from a pledge of corporeal chattels." Jones on Collateral Securities (3d Ed.), § 1.

It is also urged for defendant that conviction cannot be sustained because the money which Morey left there never became the property or funds of the bank, and even if received by Crawford as its cashier was

a special deposit for a specific purpose, to be held and applied in payment of a depositor's note when returned from the Saginaw bank, thus keeping the right of property and title to the money so deposited in Morey.

Tested by the two certificates of deposit signed by Crawford as cashier this money was received by the bank as a general deposit, payable to the order of the depositor "in current funds on return of this certificate properly indorsed," thereby establishing the relation of debtor and creditor under the settled rule as to general deposits, and not that of bailor and bailee as in case of a special deposit where the identical money left with the bank as a bare custodian must be kept distinct from the general funds of the bank, to be returned or applied as specified, the bank having no authority to mingle it with its own or other funds or use it in its business. By a general deposit the money becomes the absolute property of the bank, received as a loan, for which the bank is indebted to the depositor for that amount. The only thing Morey ever did with that general deposit was to pay or try to pay his note. If he did not succeed it yet remained a general deposit and an asset of the bank, which was indebted to him in that amount, a relation which could not be impaired by the fact that Crawford may have on that day credited from the bank's funds approximately that amount to the overdrawn account of Crawford & Colthrop.

The competency of proof of similar transactions to show intent is well settled by authority in this jurisdiction and elsewhere. That subject is quite fully reviewed by Justice FELLOWS with numerous citations in the recent case of *People* v. *Rice*, 206 Mich. 644. Admitting the general rule, defendant's counsel contend that the three transactions of which evidence was admitted were not so analogous as to come within the rule, and therefore incompetent.

Briefly stated, those transactions though not identical were similar to the one charged in the entries and manipulation of funds tending to indicate misapplication of assets of the bank. In the first, Muscott left at the bank $1,640 for liquidation of a mortgage to one Ladd. Crawford as cashier gave him an official receipt therefor and entered the amount on the deposit register of the bank as a general bank deposit by Ladd. On the same day he credited that amount as a deposit to his own account, converting the same to his own use. In the second transaction, a check payable to the First State Savings Bank for $1,025 was received by Crawford to apply upon a loan of $4,000. This was at least *prima facie* funds of the bank. He officially indorsed this check and credited the amount to his private account. In the third transaction $5,500 came into Crawford's hands as cashier of the bank in connection with the sale of some notes by the bank to the party paying the money. Instead of depositing the full amount in the funds of the bank, he indorsed $3,500 of it on a note which he had indorsed and was contingently liable to the bank for. Attending circumstances are claimed for the defense to show these were personal transactions with Crawford, involving no manipulation or misapplication of the funds of the bank and no criminal intent. These claims were recognized by the court as raising issues of fact in its charge to the jury, each act being separately referred to, and defendant's claim in relation to it stated, with the instruction that it was for them to pass upon, and consider only as bearing upon the question of intent in the case on trial if guilt was shown in that transaction, saying in part:

"The evidence of each of these transactions must satisfy your minds in each case that they were completed transactions and completed offenses in the misapplication of the funds of the bank. * * * You

cannot convict the respondent if you find that on each and every other transaction he made a misapplication of the funds if you do not think he made a misapplication of the funds as I have instructed you under the charge contained in the information."

We find no error in admission of testimony relating to those transactions as guarded in the charge of the court.

It is further urged that the court erroneously instructed the jury intent to injure and defraud followed from bare proof of the act and should be inferred from conversion of the bank's money to defendant's own use, which does not follow when a particular intent must be found. To that contention the following excerpt from the charge is quoted:

"The law presumes that every man intends the consequences of his own act; and   *   *   *   if   *   *   * knowingly and intentionally committed, cannot be justified or excused on the ground of innocent intent."

Standing alone the language might be questionable, but read in connection with the charge as an entirety it does not impress us as misleading. The court instructed the jury at length on the various issues of fact involved for them to decide and principles of law which should govern their deliberations, submitting to them defendant's claim of good faith and innocent intent, to be determined by them from all the facts and circumstances shown, which they were instructed to take into consideration, including the testimony of witnesses produced by him as to his good character and stating the proper rules of law upon that subject. The necessity of clear and distinct proof of intent as charged was more than once pointed out. During the charge the court told the jury amongst other things:

"Under the court's conception of this statute there are certain elements which I have told you must be

proven;   *   *   *   that the bank owned a note given by Dr. Morey for $2,000 that was carried on the books of the bank as an asset   *   *   *   that the defendant intended to act as such cashier of the bank for and in behalf of said bank, and that Dr. Morey did give and pay to said bank the said sum represented by the two certificates in question for payment of his said note, and the said defendant intended to and did receive said certificates of deposit and accept the same in full payment of that note   *   *   *   and that the note was paid by that transaction.   *   *   *   That the defendant took said note or funds which belonged to said bank, if you find it did belong to said bank, and wilfully misapplied said funds as the people have herein charged in their information.   *   *   *   That the defendant intended to and did injure and defraud the bank by such transaction;   *   *   *   that wilful misapplication, which is made a criminal offense by the law of this State, and the section of the law which I have read to you, or the statute referred to, means the misapplication knowingly and designedly, made by the officer charged, for his own use, and benefit or for the use and benefit of some person or company other than the bank whose money, funds or assets have been misapplied or misappropriated.   *   *   *

"So I say that the defendant must have made these entries knowingly and designedly upon the books of the bank, with intent to injure and defraud the bank. *   *   * But if a man knows that the act he is about to commit will naturally and necessarily have the effect of injuring and defrauding the bank and he voluntarily and intentionally does that act, the law will charge him with intent to injure and defraud the bank."

Counsel for defendant cite as confirmatory of their contention *People* v. *Comstock*, 115 Mich. 305, which seems to be the only previous occasion in which this court had before it for consideration the section under which the present prosecution is laid. It was there held that, as the offense charged involved a specific intent to injure and defraud a bank, such intent was not necessarily deducible from the bare fact an agent or officer of the bank extended credit to a customer

who was already a borrower there beyond the bank's legal limits, which is quite different from knowingly and intentionally making misleading entries as to the transaction and appropriating money of the bank to the agent's own use.   A comparison of the section of the Michigan act under which defendant is charged with section 9772, 9 U. S. Comp. Stat. 1916 (Rev. Stat. § 5209), discloses a close analogy in the general wording and statement of essentials to constitute the statutory offense created.   The annotations to that section of the Federal act cite and review numerous decisions construing and applying it which are illuminating upon certain phases of this case.

After an examination of this entire record with reference to the various assignments of error urged in defendant's behalf we conclude defendant has had a fair and impartial trial, with his rights energetically protected by able counsel, and find no prejudicial error calling for reversal.

The verdict will stand affirmed, and the case is remanded for judgment thereon..

FELLOWS, C. J., and WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.

The late Justice STONE took no part in this decision.